**THE COLONEL'S, INC., a Michigan Corporation, Plaintiff/Counter–Defendant,**

v.

**CINCINNATI MILACRON MARKETING COMPANY, an Ohio Corporation, Defendant/Counter–Plaintiff.**

Civ. No. 94 cv 70690.

United States District Court,
E.D. Michigan,
Southern Division.

Jan. 16, 1996.

Jeffrey A. Chimovitz, Milan, Michigan, for plaintiff.

A. Stuart Tompkins, Sheri B. Cataldo, Southfield, Michigan, for defendant.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

This matter concerns the damages due on the breach of contract claim of Cincinnati Milacron Marketing Company ("Cincinnati"), an Ohio corporation, against The Colonel's, Inc. ("The Colonel's"), a Michigan corporation. This Court has previously entered a Summary Judgment, holding that the contract was breached by The Colonel's, the original Plaintiff and Counter–Defendant in this case. Subject matter jurisdiction is established under 28 U.S.C. § 1332. The Colonel's is in the business of manufacturing automobile replacement parts for resale in the automotive after-market. Defendant and Counter–Plaintiff, Cincinnati, is in the business of building the injection molding machines utilized by The Colonel's to make these parts. Pursuant to the parties' agreement, Ohio law governs this dispute. This memorandum opinion and order constitutes the findings of fact and conclusions of law of this Court as to damages, after trial to the bench.

In July of 1993, The Colonel's executed a purchase order for two VL3000–540 injection molding machines (hereafter "Machine I" and "Machine II") from Cincinnati. The machines were to be identical, each permitting a maximum of 140.2 inches of daylight, and both were to be "reverse image" machines as specified by The Colonel's special order.

The reverse image machines were to be unique from those previously manufactured by Cincinnati, in that the operator's controls were to be on the back side of the machines, out of the reach of a normal person. The price for each of these machines, with the options and special features such as were specified by The Colonel's, was $1,569,410. With the promised discount of 19.7%, however-er, the contractual price for each machine was to be $1,290,871. Delivery of Machine I was to be made in December, 1993, and delivery of Machine II was to be made in February, 1994. The Colonel's made an advance payment on each machine.

On December 20, 1993, a *Sale and Security Agreement* ("Agreement") was at least partially executed for each machine. Each Agreement incorporated the terms and conditions of the purchase order. The Colonel's executed both, but Cincinnati only signed and dated the agreement for Machine I. Because Machine II was not ready to be shipped, no date or signature for Cincinnati was entered in the Agreement on Machine II. The Colonel's had agreed that the date of shipping would be entered when Machine II was ready. On December 27, 1993, Cincinnati shipped Machine I to The Colonel's. Payment on Machine I was due to Cincinnati 30 days from installation, but at no time later than February 3, 1994, 45 days from shipment. On January 28, 1994, before Machine II was shipped, The Colonel's rejected both Machine I and Machine II. The second *Sale and Security Agreement* was never, accordingly, completed as had been agreed.

On February 23, 1994, The Colonel's filed this suit against Cincinnati, which thereafter filed a countersuit for various breaches of contract. It later dismissed the breach of contract claim on Machine I, and this Court later dismissed The Colonel's claim for specific performance and granted summary judgment as to liability in favor of Cincinnati on its breach of contract claim for Machine II.

After The Colonel's rejection in January of 1994, Cincinnati began canvassing its customers in an effort to resell Machine II. Also, at a regional managers meeting in February, National Sales Manager Lutarewych informed all of Cincinnati's regional managers of the machine's availability. Subsequent to that meeting, the National Sales Manager directed an interoffice memo to all regional managers confirming the availability of Machine II at a new price of $1,618,320, which he based upon prices current in 1994.

Nationwide efforts to resell Machine II were unsuccessful. At trial, testimony indicated that The Colonel's order for a reverse image machine had been the first such machine Cincinnati had ever built. The National Sales Manager testified that he had known from the start that there would be difficulty in finding another buyer, and that the machine could not be sold, reversed as it was, at any price, unless he virtually gave it away.

In March of 1994, as a result of The Colonel's lawsuit, and after efforts to resell the machine had failed, Cincinnati filed this countersuit against The Colonel's for the price of Machine II. However, subsequent to filing its countersuit, Cincinnati proceeded to rebuild Machine II, to fill the previous order of an existing customer, Davidson Textron. Cincinnati now maintains that it is entitled to recover damages (including the cost of removing the Colonel's specifications and rebuilding according to the Davidson specifications), and lost profits from the wrongful breach by The Colonel's.

■ Prior to trial, Cincinnati moved to strike The Colonel's argument that Cincinnati's remedies are governed by the Ohio Revised Code Annotated ch. 1309 as opposed to ch. 1302. The Colonel's had asserted that, because the December 20, 1993, *Sale and Security Agreement* attached and was enforceable, any remedies available to Cincinnati must be governed by § 1309. Cincinnati maintains that The Colonel's failure to raise such an "affirmative defense" during the pleading stage foreclosed pursuit of such a legal argument at any time.

Since February of 1995, however, when the parties entered the Joint Final Pretrial Order, approved by this Court, all have been aware of The Colonel's argument that Article IX was the rule of law governing this claim, which Cincinnati maintained that Article II controlled. The fact that The Colonel's did not raise this legal argument in answer to the counterclaim did not result in any unfair surprise, assuming *arguendo* that this argument is an affirmative defense. Moreover, neither party has been prejudiced by The Colonel's raising its defense "by some other means other than the pleadings." *Moore v. Coffey,* 992 F.2d 1439, 1445 (6th Cir.1993)

*quoting Grant v. Preferred Research, Inc.,* 885 F.2d 795, 797 (11th Cir.1989) ("[I]f a plaintiff receives notice of an affirmative defense by some other means other than pleadings, 'the defendants failure to comply with Rule 8(c) does not cause the plaintiff any prejudice.' "); *see also Allied Chemical Corp. v. Mackay,* 695 F.2d 854, 855–56 (5th Cir. 1983) ("where the matter is raised in the trial court in a manner that does not result in unfair surprise ... technical failure to comply precisely with Rule 8(c) is not fatal."). Thus, Cincinnati's motion to strike The Colonel's defense is denied.

■ The Colonel's maintains that ch. 1309, rather than ch. 1302, governs this dispute, and relies heavily on the *Sale and Security Agreement* purportedly executed between The Colonel's and Cincinnati, for the rejected Machine II, to require such a result. However, this Court cannot agree that ch. 1309 applies.

The Colonel's never acquired the possession of Machine II which is necessary for the remedies of ch. 1309 to govern. That section of the Ohio Uniform Commercial Code provides that, when the debtor does not have or does not obtain possession of the goods, the rights of the secured party after debtor's default are governed by Article II. OHIO REVISED CODE ANN. § 1309.11. Moreover, The Colonel's did not obtain rights in the collateral as defined by § 1309.14. In general, rights in the collateral are not determined by Article IX, but by Article II. WHITE AND SUMMERS, UNIFORM COMMERCIAL CODE § 24–6 at 323 (3rd ed.1988).

Article II states that "a rejection or other refusal by the buyer to receive or retain goods, whether or not justified, or a justified revocation of acceptance revests title to the goods in the seller. The revesting occurs by operation of law and is not a 'sale.' " OHIO REVISED CODE ANN. § 1302.42. A "sale" is defined as the "passing of title from the seller to the buyer for a price." OHIO REVISED CODE ANN. § 1302.01(A)(11). Accordingly, in the case at bar, there was never a sale because The Colonel's never accepted or obtained possession of Machine II.

In *Nixdorf Computer, Inc. v. Jet Forwarding, Inc.*, 579 F.2d 1175, 1177 (9th Cir.1978), the buyer of computer goods signed a purchase agreement which contained a security interest provision. After the buyer had accepted and taken possession of the goods, the buyer breached on its payments. The seller sought damages under Article II rather than Article IX of the Uniform Commercial Code. The court stated, "had [the buyer] repudiated the contract *prior to* the delivery and acceptance of the [goods], it is clear that [the plaintiff] could have invoked the seller's remedies [of Article II]." (Emphasis added). However, once the buyer had accepted and obtained lawful possession of the goods, the purchase agreement which provided the plaintiff with a security interest could only be governed by Article IX. *Id.* at 1178.

The Colonel's, unlike the plaintiff in *Nixdorf,* never accepted or took lawful possession of Machine II before its repudiation. This is not a case in which The Colonel's accepted Machine II and then failed to complete its payment pursuant to the *Sale and Security Agreement,* which would have given rise to Article IX remedies. Rather, The Colonel's never accepted, and wrongfully rejected Machine II, thereby preventing the sale from coming to fruition. As a result of this nonacceptance, the rights of the parties under the Commercial Code fall totally within the terms of ch. 1302 (Art. II).

There is also a dispute as to whether Cincinnati may invoke the remedies of § 1302.82 or of § 1302.83. Cincinnati maintains that it may recover damages and lost profits under § 1302.82. The Colonel's contends that Cincinnati may only recover the price under § 1302.83.

The Ohio Revised Code Annotated § 1302.77, indicates that, when a buyer wrongfully rejects goods, the seller may invoke one of a number of remedies. Those remedies include either damages for nonacceptance (§ 1302.82), or the price of the goods (§ 1302.83), but the aggrieved seller must elect the appropriate remedy.

■ This Court finds that Cincinnati has elected the remedy of a suit for the price of the machine, pursuant to § 1302.83. In its verified counter-complaint, Cincinnati sought "the balance due and owing" by The Colonel's for its wrongful breach. Moreover, the language of the court-approved stipulation dismissing the other counts raised by Cincinnati in its counter-complaint indicates that such dismissal of the other counts did not constitute a waiver of "its [Cincinnati's] counterclaim against The Colonel's, Inc. *for payment in full* of the other 3000 ton machine [Machine II]." (Emphasis added). Further, the trial court must "grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." Fed. R.Civ.P. 54(c); *See Schumann v. Levi,* 728 F.2d 1141, 1143 (8th Cir.1984). On the record in this case, the Court can only find that Cincinnati did elect the § 1302.83 action for the price remedy. Thus, Cincinnati is bound by that election.

■ In order to maintain an action for price under § 1302.83 it must be shown that the goods are identified to the contract. It must also be shown that resale of the goods is impracticable, and that reasonable efforts to resell would have failed. OHIO REVISED CODE ANN. § 1302.83(A)(2); *See also* WHITE AND SUMMERS, UNIFORM COMMERCIAL CODE § 7–2 at 332 (3rd ed.1988).

The Colonel's Machine II was most certainly identified to the contract. Machine II was specially designed and built for The Colonel's, and had an identifiable purchase order number. Cincinnati had never built such a machine, and testimony indicated that strenuous efforts to resell the machine proved fruitless. *See, e.g., David v. Ultra-Lite, Inc.,* No. L–83–322, 1984 WL 7792 at *3 (Ohio App. Mar. 2, 1984), in which the court determined that the goods were sufficiently identified to the contract when the goods were specially designed for the buyer and had an identifiable purchase number. Here, Plant Manager Kinzie testified that Machine II, even though classified as a "stock machine"[1], after being rejected, was not market

---

1. A stock machine is a machine that is built to a certain specification which makes it as close to

being market ready and in a salable condition as possible.

ready or in a saleable condition. Trial testimony indisputably showed that Machine II was unique and that, after every effort had been made to find a buyer, Cincinnati commenced its countersuit against The Colonel's for the price of Machine II.

When suing for the price under § 1302.83, however, the seller must hold for the buyer any goods which have been identified to the contract and are still in his control. OHIO REVISED CODE ANN. § 1302.83(B). Where resale becomes possible, the seller may resell the goods prior to the collection of judgment, and must credit the buyer with the proceeds of that sale. *Id.*

Although Cincinnati did sell what had been Machine II to fill its prior customer Davidson Textron's order, the testimony revealed that Cincinnati did not actually resell Machine II as it had been built for The Colonel's. Rather, Cincinnati rebuilt Machine II by tearing down all specifications built for The Colonel's and rebuilding to meet the different specifications of Davidson Textron. The machine was then sold to Davidson Textron at a price far higher than that which The Colonel's had promised to pay. Accordingly, although Cincinnati had already filed suit against the Colonel's for the price, Cincinnati instead now seeks the "damages" incurred in the teardown and rebuilding of the machine. However, Cincinnati pursued this course of action at its own peril. Cincinnati's rebuilding of Machine II from the unique reverse image machine, to suit the Davidson order, could not have been what the drafters of the Ohio Commercial Code intended when they stated *"if resale becomes possible* [the seller] may resell them at any time prior to the collection of the judgment." OHIO REVISED CODE ANN. § 1302.83(B). (Emphasis added). Moreover, at the time this decision was made, Cincinnati had available another unmodified stock machine with which it could have filled the Davidson Textron order, thereby avoiding the costs it incurred in restructuring Machine II.

Moreover, § 1302.83 indicates that "where the seller sues for the price he *must* hold for the buyer any goods which have been identified to the contract and are still in his control." OHIO REVISED CODE ANN.

§ 1302.83(B). (Emphasis added). Only where resale is *possible* may the seller resell the goods. *Id.* In essence, resale of Machine II, the reverse image special-order machine, was not possible, and Cincinnati should not have rebuilt the machine, while required to hold it for the customer, to charge The Colonel's the cost of rebuilding and simultaneously deprive it of the benefit of the higher price. As a result, The Colonel's, accordingly, cannot be held liable for the costs of reconfiguration. Those costs, it also should be noted, could not be calculated in accordance with Cincinnati's own standard methods of cost attribution. Testimony was vague and documentation not standard, in proof of those costs. In addition, The Colonel's may not be penalized by Cincinnati's actions in violation of the Uniform Commercial Code's directive to hold the goods as a credit for the benefit of the buyer being sued for their price. Thus, the sale to Davidson Textron of the rebuilt Machine II will be treated as a simple resale for the purposes of § 1302.83.

Section 1302.83(B) indicates that where the goods are resold, the net proceeds must be credited to the buyer. As Machine II was ultimately sold to Davidson Textron at a purchase price of $1,398,592, the net proceeds credited to The Colonel's for the price must be $1,290,871. There was an excess of $107,721 made by Cincinnati on the resale. However, ch. 1302 indicates that a seller is not accountable to the buyer for any profit made on any resale. OHIO REVISED CODE ANN. § 1302.80(F).

Section 1302.83(C) does allow the seller to recover under § 1302.82 for lost profits where it can be shown that the seller is not entitled to recover under § 1302.83 for the price. However, all of the evidence and trial testimony here has indicated that Cincinnati was entitled to the price. *Schumann v. Levi, supra* at 1142. No contrary evidence was presented to show that Cincinnati was not entitled to receive the price of Machine II. Therefore, Cincinnati's remedies will remain under § 1302.83.

Accordingly, Cincinnati may only recover the price of Machine II. As Machine II has been resold to Davidson Textron for a profit,

this Court finds that The Colonel's is not liable to Cincinnati for any damages or lost profits stemming from its wrongful rejection of Machine II. On post-judgment motion, the Court will adjudicate Cincinnati's claim for the attorney fees and interest to which it is entitled pursuant to the parties' agreements.

IT IS SO ORDERED.